**CHEMETRON CORPORATION, a Delaware corporation, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 13454.

United States Court of Appeals Seventh Circuit.

Jan. 22, 1962.

Howard G. Krane, Chicago, Ill., Jackson B. Moore, Willis D. Nance, Chicago, Ill., C. A. Bechly, Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., of counsel, for petitioner on review.

Louis F. Oberdorfer, Asst. Atty. Gen., Jerry M. Hamovit, Tax Division, U. S. Department of Justice, Washington, D. C., Lee A. Jackson, A. F. Prescott, Thomas H. McPeters, Department of Justice, Washington, D. C., for respondent.

Before DUFFY, SWYGERT and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

The Tax Court of the United States, on December 14, 1960, sustained a determination by the Commissioner of Internal Revenue of deficiencies in petitioner's income tax for the years 1953 and 1954. The matter is here on petition for review of that decision. The deficiency asserted for the year 1953 has been disposed of by agreement, leaving for consideration that for the year 1954. Petitioner's name at the time its petition was filed

with the Tax Court was National Cylinder Gas Company (referred to as N.C.G. or the taxpayer), which was subsequently changed to that shown in the caption.

The controversy arises from certain transactions which took place between taxpayer, Robert Klotz and Byron Jackson Company (referred to as B.J.Co.). Klotz, an inventor, owned the right, title and interest in and to certain inventions and patent applications pending in the United States Patent Office. On September 1, 1950, N.C.G. entered into an option contract with Klotz, whereby the former upon exercise of the option would acquire the entire interest of the latter in the inventions and patent applications. By the terms of the contract N.C.G. was obligated to prosecute the patent applications. The contract was not assignable by either party without the prior written consent of the other.

Subsequently, one of the applications designated in the option contract became involved in an interference proceeding with an application controlled by B.J.Co. Negotiations were carried on between N.C.G. and B.J.Co. relative to this interference and, in December 1952, an agreement was reached by which B.J.Co. would acquire the option rights of N.C.G. in the inventions and patent applications.

All agree that the taxpayer, in December 1952, transferred to B.J.Co. a capital asset. The ultimate question for decision is whether the proceeds from such transaction represented a long-term or short-term capital gain. This in turn depends upon whether the assets transferred had been held by the taxpayer for more or less than six months. Section 1222 of the Internal Revenue Code of 1954 (26 U.S.C. 1958 ed., § 1222).

The taxpayer contends, as it did before the Tax Court, that it sold and assigned to B.J.Co. the rights which it acquired under the option contract with Klotz, and that having held such option for more than six months, the proceeds were taxable as long-term capital gains. The Commissioner contends, as he did before the Tax Court, that the taxpayer exercised its option with Klotz, thereby acquiring ownership of the inventions and patent applications designated therein. The Commissioner further contends that the taxpayer acquired the inventions and patent applications less than six months prior to the sale and that the proceeds therefor were taxable as short-term capital gains. Taxpayer before the Tax Court advanced the alternative theory that even though it be held to have exercised its option and thereby acquired ownership of the inventions and patent applications, such acquirement took place more than six months prior to the December transaction and it would still be entitled to a long-term capital gain.

The Tax Court decided that the taxpayer exercised its option and that the transaction with B.J.Co. was a sale of the inventions and patent applications. In so doing it stated:

> "We hold that in substance the petitioner exercised the option under the 1950 Agreement with Klotz and therefore the Assignment Agreement was a sale of the inventions and patent applications and not merely the assignment of an option."

The Tax Court, having thus decided that the taxpayer was the owner of the inventions and patent applications which it sold to B.J.Co., further held that such ownership was acquired less than six months prior to the transaction and that the proceeds were, therefore, taxable as a short-term capital gain.

It is our judgment, for reasons subsequently discussed, that the holding of the Tax Court that taxpayer sold to B.J.Co. inventions and patent applications rather than its rights under the option agreement with Klotz is clearly erroneous. We hold that the taxpayer did not acquire ownership of the inventions and patent applications, which makes irrelevant the Tax Court's holding that such ownership was acquired within six months of the time of the transaction with B.J.Co.

It may also be noted that the Commissioner, as he did before the Tax Court, advances the alternative theory that even though it be held that the taxpayer in the

1952 transaction sold its option to B.J. Co., such option was owned by the taxpayer for less than six months and, therefore, it was not entitled to a long-term capital gain. This contention was neither mentioned nor decided by the Tax Court. We conclude that this theory has no merit. We also note, although perhaps immaterial, that the Commissioner originally asserted a deficiency on the theory that the proceeds received by taxpayer as a result of the 1952 transaction represented royalty income taxable as ordinary income at the rate of 52%. No contention was made at that time that the 1952 transaction embodied the sale of a capital asset, either of the inventions and patent applications or of the option contract with Klotz.

The Tax Court had before it numerous documents and heard the oral testimony of the attorney for the taxpayer, the attorney for B.J.Co., and Klotz, all of whom had participated in some or all of the numerous agreements which were entered into by the parties. A detailed analysis of the documents or discussion of the oral testimony would unduly prolong this opinion and, in our view, is unnecessary. There are three documents which in plain, unambiguous language demonstrate that the taxpayer obtained an option agreement from Klotz in 1950 and that the rights acquired thereby were sold and assigned to B.J.Co. in December 1952: (1) the option agreement entered into between Klotz and the taxpayer September 1, 1950; (2) the agreement by the taxpayer, assented to by Klotz, by which the taxpayer agreed to assign its option to B.J.Co., and (3) the assignment executed December 6, 1952, by which Klotz sold and assigned its inventions and patent applications to B.J.Co.

Little need be said as to the 1950 agreement because it is not in dispute. By it, the taxpayer obtained an option to acquire Klotz's interest in certain designated inventions and patent applications. Taxpayer was obligated to prosecute such applications, was to receive a paid-up license as to any patents issued and during such time was to pay Klotz

$100 per month. Taxpayer was free to exercise the option at any time by giving Klotz notice by registered mail. In the event the option was exercised, taxpayer was obligated to pay Klotz a certain percent of any royalties which might be received. He was not free to sell or assign the option without Klotz's permission.

The record reveals numerous conferences and some correspondence between counsel for taxpayer and B.J.Co., in an attempt to settle the controversy engendered by the interference proceeding in the Patent Office. This all was with the approval of Klotz. On June 2, 1952, taxpayer's counsel wrote Klotz to the effect that B.J.Co. was willing to revise the option to provide that he receive 6% of whatever was obtained by way of settlement. Klotz, on June 4, 1952, replied, approving of the proposal and suggesting that he was ready at any time to sign an agreement with B.J.Co., but expressing the belief that no new agreement was necessary unless a settlement was made with B.J.Co. Other correspondence bears upon the understanding between taxpayer and Klotz; however, no formal agreement was entered into until December 4, 1952, when an assignment agreement was executed between taxpayer and B.J.Co., ratified and assented to by Klotz. This agreement, after referring to the 1950 option contract between Klotz and taxpayer and other preliminary matters, stated:

"NCG does hereby sell, assign, transfer and set over unto BJ CO., its successors and assigns, the entire right of NCG pursuant to the aforesaid option agreement dated as of September 1, 1950 to acquire by assignment the entire right, title and interest in and to the following applications for United States Letters Patent and in and to the inventions described herein * * *.

* * * * * *

" * * * NCG further covenants that it will undertake to cause to be executed and delivered to BJ CO. promptly upon execution of this agreement any and all deeds, assign-

ments, or other documents necessary to vest in BJ CO. the full and unimpaired legal and equitable title in and to the aforesaid inventions and applications * * *."

N.C.G. obligated itself to make all reasonable efforts to obtain the cooperation and assistance of Klotz in the prosecution of the patent applications. The agreement provided that Klotz would receive a certain percent of royalties to be paid by B.J.Co. to N.C.G.

The agreement further provided:

"It is expressly understood and agreed between the parties hereto that NCG, by this agreement, has sold, assigned and transferred to BJ CO. all of its rights as set forth in Article II hereof * * *."

Article II sets forth taxpayer's 1950 option agreement with Klotz.

On December 6, 1952, Klotz, pursuant to the assignment agreement, executed an assignment by which he sold, assigned, transferred and set over to BJ Co., its successors and assigns, the entire right, title and interest in the inventions and applications for patents described in the option contract between Klotz and N.C.G.

The assignment agreement, as well as the assignment, was procured from Klotz by N.C.G. at the request of BJ Co., to be delivered to the latter upon consummation of the transaction between N.C.G. and BJ Co. Explanatory of this situation is a letter dated December 4, 1952, from taxpayer's counsel to Klotz, which states, "Enclosed are quadruplicate execution copies of the agreement between this company and Byron Jackson Co. by which we will assign to BJ CO. our rights under the Option Agreement of September 1, 1950 between yourself and this company," and further, "The completed assignment will be held in our files here until we receive the fully executed agreement from BJ CO., whereupon it will be immediately delivered to BJ CO. On the happening of this event, you can assume that BJ CO. has then exercised the option rights assigned to it by NCG. Or, possibly, you will be formally advised of this

by BJ CO. In either case, it will be an accomplished fact on the delivery to BJ CO. of the assignment of the patent applications."

Both counsel for taxpayer and for BJ Co. testified that they understood the transaction to be a sale of the option by the taxpayer to BJ Co. Klotz testified to the same effect and that he had been told to consider the execution of the assignment agreement by BJ Co. as an exercise of the option. He further testified that he did not consider it necessary for the latter to notify him by registered mail that it was exercising the option. Counsel for BJ Co. also testified that he understood his company was acquiring an option and exercising it.

As a premise for its conclusion, the Tax Court found:

(1) "The payments by B.J. were the proceeds of a sale by the petitioner in December 1952, of the petitioner's ownership rights in certain inventions and patent application."

(2) "These rights were acquired by the petitioner less than six months before they were sold."

In our view, these findings are clearly erroneous; in fact, they are devoid of any record support. They are reached by indulging in inferences based on a fallacious process of reasoning.

The Tax Court, as well as the Commissioner here, places great reliance upon a clause in the assignment agreement which it is argued contradicts the express language that the sale by the taxpayer was of its option and not of the inventions and patent applications. The Tax Court in its opinion stated:

"The Assignment Agreement states that its purpose is to sell an option to certain inventions and patent applications. However, this statement is contradicted by another provision in which the petitioner 'covenants that it will undertake to cause to be executed and delivered * * * all deeds, assignments, or other documents necessary to vest in BJ CO. the full and unimpaired

legal and equitable title * * *.' In order to comply with this provision it would ·be necessary for the petitioner to exercise the option with Klotz. Petitioner denies that it exercised the option. There is no evidence that the option was ever exercised by B.J."

The clause, "undertake to cause to be executed and delivered," does not contradict the premise that taxpayer assigned to BJ Co. its interest in the option agreement and that it was Klotz who assigned and sold to BJ Co. the inventions and patent applications. In fact, the clause is not only consistent with the other provisions of the assignment agreement but supports the taxpayer's contention. If taxpayer intended to exercise the option and sell to BJ Co. the inventions and patent applications acquired thereby, it would not have agreed to "undertake to cause" itself to execute the necessary documents, it would have agreed to execute them itself. The clause plainly refers to a third party, which obviously was Klotz. The clause supports the theory that taxpayer agreed to sell its option and that "it will undertake to cause" Klotz, who was the owner of the inventions and applications, to execute and deliver documents necessary to vest title and ownership in BJ Co.

The Tax Court reasons that the fact that BJ Co. did not notify Klotz by registered mail of its exercise of the option, as provided for in the option agreement, is inconsistent with the theory that BJ Co. acquired the inventions and patent applications from Klotz. This reasoning also is without merit. After the parties had entered into an agreement by which BJ Co. was to acquire by assignment from taxpayer its option interest, and from Klotz ownership of the inventions and patent applications, it would have been an idle gesture for BJ Co. to notify Klotz that it was exercising the option, thereby requiring Klotz to convey assets which he had theretofore contracted to do. More than that, Klotz testified that he was advised, presumably by counsel, that a written notice of exercise by BJ

Co. was unnecessary. In this connection, it is interesting to note that the Tax Court found there was no proof of an exercise of the option by BJ Co. but at the same time, as subsequently noted, without proof found that there was an exercise of the option by taxpayer.

The Tax Court mentions the fact that Klotz executed the assignment of the inventions and applications to BJ Co. before the latter signed the option assignment agreement. This point ignores the realities of the situation. It is not open to dispute but that BJ Co. was desirous of obtaining the option agreement held by taxpayer and the inventions and patent applications held and owned by Klotz. It is equally evident that BJ Co. was not interested in acquiring either without the other. Thus, the option assignment agreement of December 4, 1952, between BJ Co. and taxpayer, assented to by Klotz, obligated the taxpayer to assign to BJ Co. its option rights, and Klotz to assign to BJ Co. its title and ownership of the inventions and patent applications. We think it immaterial whether Klotz or taxpayer first discharged its obligation to BJ Co., and no inference can properly be drawn against taxpayer because of the fact that Klotz executed his assignment a few days before that executed by the taxpayer.

The Tax Court also stresses the point that all payments by BJ Co. were to be made directly to taxpayer, from which it infers that taxpayer must have conveyed to BJ Co. ownership of the inventions and patent applications. The record discloses that during the negotiations between taxpayer and BJ Co., the former and Klotz agreed that all payments to be made by BJ Co. should be made directly to taxpayer and that the latter would pay Klotz 6% of payments received. This provision for payment was agreed to by taxpayer at the request of Klotz and was to be binding only in the event that taxpayer sold its option to BJ Co. Klotz testified, without dispute, that he desired this arrangement because of his satisfactory relationship with taxpayer and that he did not want to get involved with

other people. By this arrangment, Klotz made taxpayer his agent to collect and pay him in accordance with their agreement. Considered in connection with the other circumstances, we think this incident is without significance as it relates to the principal issue in controversy.

We think the Tax Court approached the problem before it in reverse order. It first found, contrary to the unambiguous language of the documentary evidence as well as the oral testimony of witnesses, that taxpayer was the owner of and sold to BJ Co. the inventions and patent applications. The taxpayer could have acquired such ownership only by the exercise of its option with Klotz. Thus, the Tax Court was faced with the necessity of finding that the taxpayer had exercised such option. The uncertainty of the time of such exercise is evidenced by the finding that it took place sometime between October 16 and December 15, 1952. The manner or means by which such exercise was effected is not disclosed. As previously noted, the Tax Court found that there was no proof of exercise of the option by BJ Co. and we hold that there was no proof of exercise by the taxpayer. In the former situation, for reasons heretofore shown, lack of proof was immaterial; in the latter, proof of exercise was imperative as a basis for the conclusion that taxpayer acquired ownership of the inventions and patent applications.

The Commissioner on brief cites four cases in support of his argument for affirmance of the Tax Court's decision. Blick v. Commissioner, 31 T.C. 611, affirmed 3 Cir., 271 F.2d 928; Barber v. United States, 115 F.Supp. 349, affirmed 8 Cir., 215 F.2d 663; Miller v. Commissioner, 8 Cir., 295 F.2d 538; Butler v. Commissioner, 43 B.T.A. 1005. No good purpose could be served in a detailed comparison of the facts of these cases with those here. We have read them and, taken as a whole, they are of no benefit to the Commissioner in the instant matter. Generally it may be said of them that the subject matter involved was a contract for the sale of property which the taxpayer was attempting to convert into an agreement for the sale of an option on the theory that such was the intention of the parties. Here, we have the opposite situation where the contract is for the sale of an option which the Commissioner attempts to convert into a contract for the sale of the property described therein.

The situation is emphasized in Butler v. Commissioner, where the Tax Court, in response to taxpayer's contention that the agreement in controversy was the assignment of an option, stated:

"Nowhere in that agreement is any reference made to an assignment * * * or to a sale of his option under that agreement. Rather the agreement, clear in its terms, deals with a sale by petitioner of the fee title to the mineral rights covered by the 1934 agreement * * *. * * the terms of the agreement with Lay, does not indicate in any way whatsoever that petitioner sold or agreed to sell his option to Lay."

Again, in the Blick case, where the taxpayer claimed that it was the intention of the parties that the agreement was for the sale of an option, the Tax Court stated (page 618):

"The transaction in question having been the subject of a written contract, we would require clear and compelling evidence to ignore the terms of that contract to the extent urged by petitioner. Such evidence is not present here."

Devoid of all substance is the Commissioner's alternative theory that even though it be held that taxpayer sold and assigned to BJ Co. an option agreement, the same was owned by taxpayer for less than six months. Taxpayer's property interest sold and assigned to BJ Co. was its right under the 1950 agreement with Klotz to acquire and become the owner of the property described therein upon exercise of the option. It is true that the option agreement at the request of BJ Co. was modified in some particulars, but taxpayer's right to acquire the property described in the option was at

all times preserved. The Tax Court recognized as much when it held, as heretofore noted, that the taxpayer exercised its option under the 1950 agreement with Klotz.

The decision of the Tax Court is reversed and the cause remanded for such further proceedings as may be required not inconsistent with this opinion.