J. KENYON WILSON, JR. AND MARY H. WILSON, ET AL, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Wilson v. Commissioner
Docket Nos. 7001-71, 3981-72, 3994-72.
United States Tax Court
T.C. Memo 1977-228; 1977 Tax Ct. Memo LEXIS 207; 36 T.C.M. (CCH) 948; T.C.M. (RIA) 770228; July 25, 1977, Filed *207 Held, whether petitioners' capital asset is determined to be real estate or an option to purchase real estate, the holding period of the asset was not more than six months and the sale thereof resulted in short-term capital gain. Charles C. Shaw, Jr. for the petitioners. Robert A. Johnson, for the respondent. STERRETT
MEMORANDUM OPINION STERRETT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket Petitioner
No.
Year
Amount
J. Kenyon Wilson, Jr.
7001-71
1968
$ 4,371.16
and Mary H. Wilson
Estate of Carl Pinnell
3981-72
1970
5,002.82
White, Deceased, Letitia
H. White, Administratrix,
and Letitia H. White
J. Kenyon Wilson, Jr.
3994-72
1970
24,553.22
and Gwendolyn J. Wilson
Due to concessions [2] *208 by petitioners the issues remaining for decision are whether an option or real estate was sold by petitioners and whether that sale resulted in a long-term or short-term capital gain. This case was submitted under Rule 122 hence all of the facts have been stipulated and are so found. Except for Carl P. and Letitia H. White, all petitioners resided in Elizabeth City, North Carolina at the time of the filing of their respective petitions herein. Petitioners, Carl P. and Letitia H. White, resided in Poplar Branch, North Carolina at the date of the filing of their petition herein. All of the returns at issue were filed on the cash basis of accounting with the district director of internal revenue, Greensboro, North Carolina. *209 Sometime prior to June 1, 1967 petitioners J. Kenyon Wilson (Wilson) and Carl P. White (White) entered into a joint venture to acquire the right to purchase 635 acres of oceanfront property in Currituck County, North Carolina, which was owned by the Currituck Shooting Club [3] (the Club). Although Wilson and White had equal interests in the joint venture arrangement, White served as the nominee of the venture and the ostensible participant in all transactions. Sometime prior to June 1, 1967 informal oral communications occurred between White and Hugh E. Paine (Paine), secretary of the Club, concerning acquisition of the right to purchase the oceanfront property. On June 1, 1967 Paine wrote White stating, in pertinent part, "* * * I will be glad to submit to the membership any firm bid that you may have." On June 16, 1967 White responded to Paine's letter of June 1 proposing to take a 90-day option for the sale of the beachfront property for $1,000,000 with $5,000 down, said option money to be forfeited if the option was not exercised or to be applied to the purchase *210 price if exercised. Alternatively, he proposed the sale of the entire property, including the marsh and the club house for $1,250,000 with a 90-day option price of $7,500 to either be forfeited or applied to the purchase price. Although White stated a cash or deferred payment basis sale of the property would be acceptable to him, he believed "it may be a little easier to dispose of the property if it [the sale] were on" an installment basis. White closed his June 16, 1967 letter to Paine as follows: If you are interested in any of these propositions, please let me know and I will arrange to have the option drawn up and delivered to you for signature at which time I can pay the option price. On June 20, 1967 Paine responded [4] to White's letter of June 16, 1967 as follows: We will be delighted to give you an option for 90 days on the beach front property at $1,000,000.00 for a payment of $5,000.00 down which will be forfeited if the option is not exercised or will be applied on the purchase price if it is. We do not want to do this on a deferred payment basis, but strictly on a cash basis. We wish, however, to reserve for ourselves a 100-foot right of way to the beach at *211 the southern extremity of the plot. Please have the necessary option drawn up and send it to me for my signature. On June 27, 1967 White transmitted a proposed option agreement and a check for $5,000 to Paine. The option agreement provided that it was entered into on the 26th day of June, 1967 and gave the buyer (White) up to and including September 28, 1967 to exercise the option. The option also provided that within a reasonable time after exercise of said option the seller (the Club) shall deliver to buyer a general warranty deed; and the buyer had the right to assign this option or designate another person as the grantee in the aforenoted deed. On July 21, 1967 Lawrence R. Condon (Condon), attorney for the Club, wrote White that the proposed option agreement, in its present form, was unacceptable and would have to be considerably revised. He returned therewith the proposed agreement and White's $5,000 check stating, in part: * * * [The] By-laws of the Club do not permit any action regarding the sale of real property without a regular formal meeting of the members *212 of the Club, which cannot take place until a later date, since most of the members are on vacation at widely scattered points. While Mr. Paine's request in his letter of June 20, 1967, that you submit an option agreement was made with the best of intentions, you must realize that such an agreement would have to be in proper form and approved by the membership as well as by counsel. * * * In the meantime I am returning the proposed option agreement and your check. On July 28, 1967 Wilson, having seen Condon's letter of July 21, dispatched a letter to Condon on behalf of White. Wilson stated that the option agreement as prepared and tendered, along with payment therefor, was in accord with the agreement between Paine and White as set forth in their correspondence immediately prior to the preparation of the option. He believed the agreement was prepared in form entirely acceptable under the laws of North Carolina but nonetheless would not object to modifications thereof if they were consistent with the agreement entered into between the parties. Also he stated: On the other hand, I am inclined to believe that it is not so much a question of the form of the option as it is *213 that Mr. Paine apparently must not have had authority to enter into the agreement as you refer in the fourth paragraph of your letter to his best intentions. If this be the case please let me know when it might be expected that authority will be given and if this date is in the reasonable foreseeable future we will withhold further action until that time. By letter of November 1, 1967, Condon, by one of his associates, informed Wilson that the members of the Club had authorized the granting of a 90-day option to White for a consideration of $5,000 for the sale of the Club's beach land at a sales price of $1,000,000. He enclosed an unexecuted copy of the proposed option agreement which contained the form of contract of sale to be executed in the event the option was exercised. On November 7, 1967 Wilson wrote Condon expressing concern with respect to the marketability of this property under the terms of the option, to wit: (1) insurability of title without exception, (2) restrictions on shooting of waterfowl on the property, and (3) the date the 90-day option was to begin. [5] On November 20, 1967 Wilson transmitted a check for $5,000 to Condon as consideration for the option *214 to White. Thereafter, on November 22, 1967, Condon acknowledged receipt of this $5,000 check and forwarded an executed copy of the option agreement with an attached contract of sale to Wilson. The option states that it is an exclusive option [witnesseth clause], shall be assignable only with the written consent of the Club, and expires at 5:00 P.M. on the 90th day after the date of delivery to White. The attached contract of sale required, in part, insurability of title without exception by Lawyer's Title Insurance Corporation of Richmond, Virginia and restrictive covenants to be placed in the deed prohibiting, upon subdivision of the premises, shooting of waterfowl. [6]
*215 Wilson, on January 16, 1968, again on behalf of White, wrote Condon proposing two alternative modifications to the option agreement; [7] by letters of January 19 and January 24, 1968 Condon informed Wilson that White's alternative proposals would be placed before the members of the Club at the earliest possible date. On February 15, 1968 Condon, by letter, advised Wilson that the members decided to accept, in principle, the second proposed modification to the option as noted at footnote 7, supra. *216 On February 23, 1968 Wilson and Condon participated in a telephone conversation in which they agreed to further modify the terms of the option agreement [8] and extend the option up to and including March 8, 1968. Both parties, by letter of the same above date, confirmed this telephone conversation and Wilson formally exercised the option on behalf of White stating in part, as follows: Confirming our telephone conversation, Mr. Carl P. White elects to exercise the option of November 22, 1967 as modified to incorporate the principal terms of the second option outlined in my letter to you dated January 16, 1968, as likewise modified and agreed upon in the recent meeting of the members of the Currituck Shooting Club and as expressed in the form of Agreement of February    , 1968 enclosed in your letter of February 15, subject to such changes in form as suggested by Calder W. Womble * * *. [9]
*217 Wilson enclosed White's bank draft for $45,000 and the executed modified agreement. This option agreement recited November 22, 1967 as the date the Club granted White the option and the executed contract of sale, dated February 23, 1968, also provided that this contract was pursuant to said option agreement dated the 22nd day of November 1967. Between March 4, 1968 and May 13, 1968 the parties made preparations to transfer the oceanfront property. On May 13, 1968 Condon sent a deed and a deed of trust to Wilson. The deed, dated May 13, 1968, named the Club as the grantor and White as grantee; the deed of trust, dated May 15, 1968, was between White in favor of Calder Womble, as trustee, and the Club, securing the payment of the negotiable installment note in the amount of $800,000, made by White in favor of the Club. Thus upon the transfer of the property to White, the Club received consideration of $1,000,000 as follows: Option deposit
11/20/67
$ 5,000
Option exercise
2/23/68
45,000
Delivery of deed
5/13/68
150,000
Note secured by deed
of trust
5/15/68
800,000
$1,000,000
On May 31, 1968 Wilson wrote H. R. Davis (Davis) stating that the *218 property conveyed to White by the Club for his benefit had been conveyed to Davis by deed dated May 15, 1968. Also by letter of May 31, 1968, Wilson transmitted a copy of the deed dated May 15, 1968 showing White and his wife as grantors and Davis as grantee. [10] Moreover Wilson stated: We are pleased to have closed your purchase from Currituck Shooting Club, Inc. through the exercise of the option which you purchased from Carl P. White and the undersigned, title having passed through Mr. Carl P. White for your benefit. * * * Upon the transfer of the property to Davis, Wilson and White received consideration as follows: Check deposited 2/19/68
$ 50,000
Check deposited 5/8/68
200,000
Note payable to Wilson
dated 5/14/68
75,000
Note payable to White
dated 5/14/68
75,000
Assumption of note
dated 5/15/68
800,000
$1,200,000
Wilson and White each reported long-term capital gain in 1968 from the sale of an option as follows: Wilson
White
Selling price
$102,500.00
$102,500.00
Less: Costs and
Expenses
7,764.50
3,764.50
Total gain
$ 94,735.50
$ 98,735.50
Gross profit per-
centage
92.42%
96.33%
1968 collections
$ 27,500.00
$ 27,500.00
Gain recognized
$ 27,415.50
$ 26,490.74
*219 In 1970 Wilson and White each agreed to accept prepayment of $51,730 from Davis in satisfaction of their $75,000 notes. The notes were not due until 1973. Wilson and White each reported long-term capital gain in 1970 from prepayment of the $75,000 notes in the amount of $44,544.14. Respondent determined that the holding period for the property sold in 1968 was less than six months and denied long-term capital gain treatment to the petitioners in 1968 and 1970. Because no deficiency resulted from the respondent's determination with respect to petitioners Carl P. and Letitia H. White, for 1968, a statutory notice of deficiency was not issued to them for said year. For petitioners to prevail it is incumbent upon them to establish that they sold their option or contract rights to Davis which they previously held for more than six months. The parties agree that, if we find petitioners sold realty, gain on the sale thereof would constitute short-term capital gain since the holding period of the real property was less than six months. In determining whether there was a sale of the option or whether White exercised the option and subsequently sold the realty to Davis, it is well *220 settled that the courts are not bound by the form of the transaction. Miller v. Commissioner, 295 F.2d 538 (8th Cir. 1961) affirming a Memorandum Opinion of this Court; Fraser v. Commissioner, 64 T.C. 41, 49 (1975). Petitioners on brief concede "* * * that if only the contract of February 23, 1968 and deeds from the Currituck Shooting Club to White and from White to Davis be considered, this limited form of a transaction when viewed alone would demand a conclusion that a sale of land * * * occurred." However, petitioners contend the substance of the entire transaction is that they acquired an option or contractual right to purchase the Club's property on June 20, 1967 and sold the same, to Davis, on February 19, 1968. [11] To reach this conclusion petitioners point to Wilson's letter of May 31, 1968 to Davis stating that they closed Davis' purchase of the Club's property through the exercise of the option which Davis purchased from them, title having passed through White for Davis' benefit. Moreover alignment of Davis' payments to Wilson and White and White's payments to the Club reveals that Davis paid petitioners $50,000 on February 19, 1968 and *221 that White exercised the option, paying the Club $45,000 on February 23, 1968 (White previously submitted $5,000 as an option deposit on November 20, 1967); and Davis supplied petitioners with $200,000 on May 8, 1968, White paying the Club, upon delivery of the deed, $150,000 on May 13, 1968. [12] This allegedly shows that White and Wilson were acting as Davis' nominees as of February 23, 1968, Davis on February 19, having purchased White's option. It was obvious that petitioners did not want the Club to know what they were doing with Davis; likewise it was obvious that they had to continue their actions as nominees through the entire transaction in order to honor the Club's stipulation that an assignment of the option could only be made with the written consent of the Club. *222 Respondent, citing a multitude of cases, [13] does not agree with petitioners' contention and neither do we. Initially, we are perplexed by petitioners' failure to place in the record the documentation relevant to the negotiations and sale between White, Wilson and Davis. The record is replete with written documentation concerning the negotiations and ultimate sale of the Club property to White. The only evidence we have concerning the alleged sale of the option is Wilson's letter of May 31, 1968 to Davis. Petitioners ask us to infer from Davis' dates of payment to them that they acted as Davis' nominees and that on February 19, 1968 they sold their option to Davis. This certainly is one plausible explanation. However, as respondent correctly argues, the February 19, 1968 payment by Davis could have been an advance payment for the promise by White to transfer the real property to Davis at a future date. In short, the record is incomplete; petitioners have not met their burden of proof. *223 If it is true that, even if petitioners had introduced in the record a contract of sale purporting to assign their option, such evidence would not conclusively establish their case. The agreement must be construed in light of the surrounding circumstances as disclosed by the evidence. Miller v. Commissioner, supra at 543; Chemetron Corporation v. Commissioner, 299 F.2d 644 (7th Cir. 1962). However, petitioners have not provided us with the surrounding circumstances, to wit, evidence concerning the negotiations and sale between White, Wilson and Davis. In view of the great lengths petitioners went to document their negotiations with the Club we suspect that there must be similar written documentation, including a contract of sale, between petitioners and Davis. Petitioners' failure to enter this side of the transaction in the record certainly creates, in our minds, an unfavorable inference. See The Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946). Hence we are unable to ascertain the intent of the parties and cannot find, and will not infer, that the ultimate transaction that occurred herein was the *224 sale of an option and not the sale of land. [14]
Notwithstanding the foregoing, if one assumes a sale of the option occurred, we are of the opinion that White and Wilson did not hold the contract for more than six months prior to its sale. [15] Hence sale of the option to purchase the land would result in short-term capital gain to petitioners. We note petitioners' argument on brief to the effect that "[if] the minds of the parties meet upon a proposition, which is sufficiently definite to be enforced, the contract is complete, although it is in the contemplation of the parties that it shall be reduced to writing as a memorial or evidence of the contract * * *," Elks v. North State Life Ins. Co.,159 N.C. 619, 75 S.E. 808 (1912). "The fact that * * * attorneys for the *225 parties were engaged in drafting and were attempting to agree upon the language of an instrument which would spell out in detail not only the essential but also the subordinate features of the agreement, does not compel the conclusion that the minds of the parties had never met upon those features which were essential to form a binding contract." Yaggy v. B.V.D.Company,7 N.C. App. 590, 600173 S.E.2d 496, 503 (1970). Therefore petitioners contend that Paine's letter of June 1, 1967 to White indicated that he had the authority to take any offer White made to the membership of the Club for approval. White's offer of June 16, 1967 was accepted in Paine's letter of June 20, 1967; and the wording of this June 20 letter clearly indicates, to anyone reading it, that Paine had taken White's proposals to the membership and that such offer was accepted. Therefore, petitioners continue, a contract was made at this point and the parties were then looking to preparation of a written instrument to incorporate the terms and conditions that had already been established. Although the parties had agreed to a 90-day option, the commencement and termination time had not been *226 fully spelled out. However this is not fatal under North Carolina law. In Atkinson v. Wilkerson,10 N.C. App. 643, 179 S.E.2d 872, 875 (1971), the court stated: Where the duration of the contract is not specified, it will continue for a reasonable time, taking into account the purposes of the parties and is terminable at will be either party upon reasonable notice. Furthermore, petitioners note, Paine as secretary and agent of the Club, had the authority to in fact bind his principal, the Club, in the sale of realty. [16] As stated in Tuttle v. Junior Bldg. Corporation,228 N.C. 507, 512, 46 S.E.2d 313, 317 (1948): The rule limiting the authority of officers in respect to the sale of real property is not, however, inflexible. * * * [17] In determining whether the rule must be applied, the business in which the corporation is engaged, the duties necessary to be performed by its officers, the relation of the property dealt with to the business and to its other property, the surrounding circumstances and the principle *227 that corporate officers have "the implied power, in the absence of express limitations, to do all acts on behalf of the corporation that may be necessary or proper in performing" their duties must be considered. * * * Petitioners concede that the major purpose of the Club is to provide land and facilities for its members to hunt waterfowl, but contend that the Club was selling lands (beachfront *228 property) not adaptable to this purpose. Paine was the only full-time officer of the corporation and the only officer that negotiated with White. Although Paine made it clear that he had to submit any firm bid to the Club membership, his letter of June 20, 1967, in light of all the circumstances, would and did lead one to the conclusion that he had taken White's proposal before the membership and had obtained approval say petitioners. Therefore, having the implied authority to sell the Club's land Paine, in fact and law, bound the Club to an option on June 20, 1967, which petitioners sold to Davis on February 19, 1968. We do not agree with foregoing contentions of the petitioners. Under the facts of the instant case, if we assume petitioners sold their option rights to Davis, it is our opinion that they acquired said rights on November 22, 1967 and sold them on February 19, 1968. We base our decision on two grounds. First, assuming that Paine had the authority on June 20, 1967 to bind the Club, the proposed option agreement prepared by Wilson provided that it was entered into on June 26, 1967 and gave White until September 28, 1967 to exercise it. No attempt was made to exercise *229 this option on or before September 28, 1967 and it thereby expired. We do not believe that the November 22, 1967 option was essentially a continuation of the June 26, 1967 option. Although both options provided for a 90-day time period, consideration of $5,000 and sale of the same land for $1,000,000, they differed, in part, in the following respects: (1) the June 26 option provided petitioners with the right to assign their option rights while the November 22 option only provided assignment with the written consent of the Club; and (2) the June 26 option did not refer to a contract of sale to be executed by the parties upon exercise of the option while the November 22 option annexed thereto a contract of sale specifying, among other things, the cash payment terms to be followed, restrictions on shooting of waterfowl on the property, and the insurability of title without exception by a title insurance company. [18]
We do not believe that these variations relate to non-essential terms. However, under any circumstances the record reflects that Wilson in his November 7, 1967 letter *230 to Condon expressed concern over the commencement date for the option. The November 22 option reflected Wilson's request that the option run from the date of its delivery. The proposed June 26 option only provided a September 28 termination point. Moreover, Wilson's written correspondence to Condon and other documents confirm our opinion that the June 26 and November 22 options were separate and distinct assets. On February 23, 1968 Wilson, on behalf of White, specifically exercised the option of November 22, 1967, with modifications thereto; the option agreement of February 23, 1968 recited November 22, 1967 as the date the Club granted White the option and did not refer to the alleged June option; and the executed contract of sale also provided that it was pursuant to the option agreement of November 22. Therefore if petitioners in fact sold their option to Davis on February 19, 1968 they sold a capital asset which they previously held for less than six months. [19] Gain from the sale thereof is, necessarily, short-term capital gain. *231 Secondly, application of the stipulated facts to law of North Carolina, as cited herein by petitioners, leads us to the conclusion that on June 20, 1967 there was not a meeting of the minds of the parties to all essential terms, to wit: Paine and White had agreed upon a 90-day option but had not determined when the time period was to begin or end. A time factor or limitation in an option is of the essence, "[it] goes to the very nature of the option." Reily v. Commissioner, 53 T.C. 8, 12 (1969). We have previously stated that Wilson in his November 7 letter to Condon expressed concern over the commencement date for the November 22 option. We infer that if in November of 1967 Wilson, an attorney, believed "time was of the essence" he must also have been of the same opinion in June of the same year. Additionally, the only reference in the record to the June 26 - September 28, 1967 option period is in the proposed option agreement of June 26, 1967. As respondent points out on brief, we have no indication that the Club ever agreed to this time period and Condon's letter of July 21, 1967 to White stated the proposed option agreement was unacceptable. Also, we note *232 that petitioners' reliance on the reasonable length of time standard set out in Atkinson v. Wilkerson, supra, is inapposite. The issue, as we see it, is when the 90-day option was to begin and end. Moreover, under Atkinson v. Wilkerson, supra, it appears that Condon's letter declaring the option agreement unacceptable terminated the alleged contract. Based on the correspondence between White and Paine, to wit: Paine's letter of June 1, 1967 stating he would submit any firm bid by White before the Club membership, White's June 16 letter proposing a 90-day option and Paine's June 20 letter stating "we would be delighted to give you an option for 90 days * * *," White and Wilson may have speculated they had a binding option from the Club as of June 20, 1967. However, we believe under the facts of the instant case and applying the factors enumerated in Tuttle v. Junior Bldg. Corporation, supra, Paine as secretary of the Club did not have the authority to bind the Club in the sale of realty. This is apparent in light of Condon's letter of July 21, 1967 to White stating the option as drafted was unacceptable and that "the *233 By-laws of the Club do not permit any action regarding the sale of real property without a regular formal meeting of the members of the Club, which cannot take place until a later date. * * *" Paine's lack of authority to bind the Club in a sale of realty was recognized by Wilson in his July 21, 1967 letter to Condon stating, "I am inclined to believe it is not so much a question of the form of the option as it is that Mr. Paine apparently must not have had authority to enter into the agreement * * *." Based upon the record submitted, the shooting Club, a nonprofit corporation, organized to provide its members with land and facilities to hunt waterfowl was obviously not in the business of selling real property. Paine, as secretary of the Club, had no authority express or implied, to sell the Club real estate without approval of the Club membership. We have previously noted petitioners' argument that Paine was the only full-time officer of the corporation. However the record does not so indicate and we are uninformed of the secretary's duties. It is reasonable to assume that one dealing with a secretary of a shooting club would not expect him to have the authority to sell the *234 Club's land. A "secretary" is not normally the chief executive officer. Petitioners were on notice that Paine need submit their offer to the membership for approval and the surrounding circumstances do not point to an implied power granted Paine to act on behalf of the corporation and sell its realty. See Tuttle v. Junior Bldg. Corporation,supra.Moreover, we believe it customary when a corporation grants an option and enters into a sale of its realty, of this magnitude, that petitioners [the buyers] request and receive a corporate resolution providing that the option/sale was approved by the membership as required by the by-laws of the Club, and the laws of North Carolina. [20] In this regard, we note the Supreme Court of North Carolina's statement in Fleming v. Employers Mutual Liability Ins. Co. of Wis.,269 N.C. 558, 561, 153 S.E.2d 60, 62 (1967), as follows: A third person dealing with a known agent may not act negligently with regard to the extent of the agent's authority or blindly trust the agent's statements in such respect. Rather, he must use reasonable diligence and prudence to ascertain whether the agent is acting and dealing *235 with him within the scope of his powers. The mere opinion of an agent as to the extent of his powers, or his mere assumption of authority without foundation, will not bind the principal; and a third person dealing with a known agent must bear the burden of determining for himself, by the exercise of reasonable diligence and prudence, the existence or nonexistence of the agent's authority to act in the premises. *236 In view of the record presented and under the laws of North Carolina, the sale of petitioners' capital asset, whether it be an option or real estate, resulted in shortterm capital gain. Decisions will be entered for the Respondent. Footnotes
1. Cases of the following petitioners are consolidated herewith; Estate of Carl Pinnell White, Deceased, Letitia H. White, Administratrix, and Letitia H. White, docket No. 3981-72; and J. Kenyon Wilson, Jr. and Gwendolyn J. Wilson, docket No. 3994-72.↩
2. Petitioners, J. Kenyon Wilson, Jr. and Gwendolyn J. Wilson do not contest respondent's determination that they failed to report, in 1970, fees in the amount of $15,369.58 and that they were not entitled, in 1970, to an interest expense deduction, as an itemized deduction, in excess of $8,279.96. Additionally, petitioners J. Kenyon Wilson, Jr. and Mary H. Wilson concede that for 1968 they are not entitled to a deduction for gasoline in excess of $1,927.70.↩
3. Currituck Shooting Club was a nonprofit corporation organized under the laws of the State of North Carolina.↩
4. All of Paine's written correspondence, contained in the record, was on the Club letterhead.↩
5. In connection with the commencement date of the option Wilson's letter stated: 3. The delay in receiving the proposed draft and the delay which we unfortunately experience [sic] in arranging a conference with Mr. White and clearing the above items with you, leaves Mr. White less than 90 days in which to negotiate for a sale. Consequently, it will be our request that your clients grant Mr. White 90 days from the delivery of the option and let the option so provide. ↩
6. The option agreement and contract of sale alleviated Wilson's concerns expressed in his letter of November 7, 1967.↩
7. 1. Accept an additional $45,000.00 payment for an extension of the option until and including July 15, 1968, with the then total payment of $50,000.00 to be forfeited or surrendered in the event the option is not exercised. If the option is exercised the payment of the balance of the purchase price would be in cash with closing on a time table similar to that contained in the current option. OR 2. Accept payments in cash totalling $200,000.00 (5M option money, 45 M at exercise of option and 150 M at closing) with deferred payments of $200,000.00 annually for four (4) years with interest payable semi-annually at 5%. The maker would reserve the right to prepay in full at any time. The notes for the deferred payments would be secured by deed of trust on the property.↩
8. These were minor modifications, to wit: (1) One note of $800,000 instead of a series of 4 notes of $200,000 each, (2) the addition of the words legal seal in lieu of the initials L.S., and (3) all funds would be in the form of New York bank drafts. ↩
9. Condon's February 23rd letter also referred to the option granted by the Club on November 22, 1967, due to expire by time limitation on February 23, 1968.↩
10. The aforenoted deeds between the Club and White and White and Davis were both duly recorded in Currituck County, North Carolina.↩
11. Additionally Davis assumed on May 15, 1968 White's $800,000 note to the Club. ↩
12. We note the stipulated facts provide that Davis' $50,000 payment was deposited on February 19, 1968. We are not informed when petitioners received this money. Petitioners continually argue that the alleged sale occurred on February 19, 1968 although they refer, on reply brief, at times to a February 18 sale date. Hereinafter, for purposes of this opinion, we shall refer to the alleged option sale date as February 19, 1968.↩
13. Blick v. Commissioner, 31 T.C. 611 (1958), Barber v. United States, 215 F.2d 663 (8th Cir. 1954) cert. denied 348 U.S. 897 (1954), Butler v. Commissioner,43 B.T.A. 1005↩ (1941); et al.
14. Our holding should not be interpreted as discouraging submission of cases under Rule 122.However we note that submission under Rule 122 "does not alter the burden of proof, or requirements otherwise applicable with respect to adducing proof, or the effect of failure of proof." Rule 122(b). Thus cautious parties should be certain of meeting their burden upon submission of the evidence.↩
15. In the instant case gain from the sale of the option would be capital gain. Sec. 1234; Sec. 1.1234-1(a), Income Tax Regs.↩
16. We note that respondent, not in privity with the Club, petitioners or Davis at the time of sale, may not interpose an objection to transaction based upon the statute of frauds. Camp v. Commissioner, 21 B.T.A. 962, 965 (1930); Wheelock v. Commissioner, 16 T.C. 1435↩ (1951). 17. We are surprised by petitioners' deletion of the following sentence from the above quotation; its inclusion would have been a fairer statement of the rule."Where a corporation is authorized to and does in fact engage in the business of buying and selling real estate and its officers are in the habit of conveying the property purchased as a part of the corporate stock in trade with the silent approval or acquiescence of the board of directors, authority so to do will be implied."↩
18. We note that the June 26 option provided for the seller to deliver a general warranty deed.↩
19. As stated in Reily v. Commissioner, 53 T.C. 8↩ (1969), no provision exists in the Internal Revenue Code of 1954 as amended authorizing, in a situation such as this, the tacking of holding periods of separate contracts.
20. In Tuttle v. Junior Bldg. Corporation,228 N.C. 507, 46 S.E.2d 313 (1948), the court stated at page 317, "* * * [the] presence of the [corporate] seal raises a presumption of authority having the force of prima facie evidence that its execution was the act of the corporation and that the seal was affixed thereto by legally exercised authority of the company. Further we note the statement in Yaggy v. B.V.D. Company,7 N.C. App. 590, 173 S.E.2d 496, 504 (1970) as follows: * * * [The] power of a corporate officer or agent to contract for the sale of the corporate lands does not necessarily have to be conferred by a formal resolution of the board of directors, but may, as in case of other power, be inferred from the conduct of the corporation in the transaction of its business and the power which the corporation has customarily permitted the officer or agent to exercise. * * * However, in the instant case, the Club was not in the business of selling realty and the record does not indicate that the Club customarily permitted Paine to exercise such abnormal powers.↩